BURNHAM (CLARK v.).  See Case No. 2,-816.

BURNHAM (CRAWFORD v.).  See Case No. 3,366.

## Case No. 2,175.

### BURNHAM v. HEWEY.

[1 Hask. 372.][1]

Circuit Court, D. Maine.  Sept., 1871.

DEED—WHO MAY QUESTION — MORTGAGE — PRESUMPTION OF PAYMENT — FORECLOSURE — REGULARITY—EJECTMENT—DEFENSES.

1. The validity of a conveyance, under authority of the resolves of the legislature of Maine (chapter 25, 1847; chapter 409, 1852), made by William Sohier, of land in Franklin county of which Benj. Joy died seized, cannot be questioned by a stranger to the Joy title.

2. The validity of a sale of real estate by an administrator cannot be avoided for irregularity by a stranger to the decedent's title, if the court granting the license had jurisdiction of the matter, and the deed is duly executed and recorded. Rev. St. Me. 1857, c. 71, § 30.

3. The foreclosure of a mortgage of land under chapter 333 of the Laws of Maine of 1838 is invalid, unless the notice of foreclosure and certificate of its publication are recorded in the registry where the mortgage is recorded, although by the division of the county since the record of the mortgage, the lands become situated in another county at the time of the foreclosure proceedings.

4. Presumption of payment of a mortgage debt arises after the lapse of fifty years, when the original mortgage and notes secured by it are not produced and the premises have been occupied nearly the whole period by the mortgageor.

5. Such presumption is rebutted by proof that the mortgage debt has not been paid, and that the mortgage has always been regarded as outstanding by the mortgageor.

6. The purchase of a disputed title to real estate in Maine affords no defence to the tenant in an action to eject him because of maintenance or champerty.

Writ of entry [by Daniel Burnham] to recover [from Andrew I. Hewey] the possession of land.  Plea, nul disseizin.

James O'Donnell, for demandant.
H. L. Whitcomb, for tenant.

Before CLIFFORD, Circuit Justice, and FOX, District Judge.

FOX, District Judge.  On the third day of June, A. D. 1821, James Hewey, the father of the tenant, mortgaged to Benjamin Joy of Boston, Mass., "one hundred acres of land in Plantation No. 6 in the county of Oxford" which has since been incorporated as "Phillips in the county of Franklin" as security for the payment of said Hewey's four notes, each for thirty seven dollars and a half, payable in four annual payments with annual interest.  This deed was recorded in the proper registry at Paris in said county of Oxford on the 18th June,

1823, and it recites "that the same land had been that day conveyed to Hewey by Joy."  James Hewey continued in the occupation of the mortgaged premises as his homestead until his decease in 1869, and the tenant has since been in the possession of the same, claiming them as heir of his father.  The demandant, as assignee of this mortgage, seeks to recover in this action the mortgaged premises, alleging that the mortgage has been foreclosed pursuant to the laws of this state, and that by sundry mesne conveyances he has acquired all the estate and interest of Benj. Joy therein, under and by virtue of said deed of mortgage.  The defence is, that the mortgage debt has been paid, and also that the demandant has not obtained a valid conveyance of the title under the mortgage to Joy.

The execution of the mortgage was admitted and also the death of Benj. Joy.  By a resolve of the legislature of Maine (chapter 25, Acts 1847), it was enacted upon the petition of Elizabeth Joy & als., "that all sales and conveyances of the real estate, situated in this state, of which the late Benj. Joy of Boston died seized, heretofore made by said petitioners, or any of them, in pursuance of or to fulfill any contracts, bonds or other instruments, made or entered into by said Benjamin during his lifetime, &c., * * * be and they are hereby ratified and confirmed, &c., * * * and that Wm. Sohier of Boston be and he is hereby authorized and empowered to make, execute and deliver to any and all persons, holding titles under such conveyances, respectively, confirmatory deeds, &c., * * * and that said Sohier be and hereby is authorized and empowered to make partition of, and also to sell and convey at his discretion, at such times, for such considerations and in such way and manner as he shall judge best the whole or any parts or parcels of the real estate in this state, of which the said Benjamin died seized and not included in any of the contracts, bonds or other instruments for the conveyance of the same made by the said Benjamin in his lifetime, and now undischarged or unsatisfied, or in any of the conveyances aforementioned, * * * and to make, execute and deliver to any and all persons so purchasing said remainder of said estate or any part thereof good and sufficient conveyances of any and all parcels of land so sold, to hold the same to them and their respective heirs, successors and assigns, in fee simple or for any less estate.  * * * In 1852, by another resolve of the legislature (chapter 409, approved March 30th), Wm. Sohier was authorized "to sell and convey at his discretion by public or private sale, at such time and times, &c., the whole or any parts or parcels of the real estate of which the late Benj. Joy died seized or entitled to either alone or as tenant in common with others, saving and excepting such of said lands as have been heretofore sold

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

and conveyed by the late Hannah Joy, relict of said Benjamin, as his executrix, and also such as said Sohier is already authorized to sell and convey by virtue of a former resolve, * * * and to make, execute and deliver to any and all persons purchasing the same, good and sufficient conveyances of any and all parcels of land so sold in fee simple or for any less estate; * * * intending hereby. that under this resolve taken in connection with the resolve before mentioned, the powers of sale conferred on said Sohier shall extend to the whole estate of which said Benjamin died seized, excepting only such lands as the said Hannah undertook to sell as his executrix."

Under the authority of these two resolves, Wm. Sohier, in consideration of three thousand dollars paid by Daniel Austin & als., on the sixth day of Sept., 1858, by his deed of that date duly executed, released and quitclaimed to said Austin & als., various lots and parcels of real estate including the demanded premises, the deed reciting "that to several of the parcels no title is given save a title as mortgagee."

The authority of Sohier to convey the interests of the Joy estate in these lands under these resolves was presented to the supreme court of this state for its consideration, in the case of Williamson v. Carlton, 51 Me. 451. The deed from Sohier to Cotting in that case being in all respects similar to that now under consideration. In that case, as in the present, the tenant did not claim under the Joy heirs or devisees, but was a stranger, denying the validity of the deed when produced in evidence by the complainant. Mr. Justice Barrows, in delivering the opinion of the court (page 453), says: "When the rights of citizens have been invaded by any unwarrantable arbitrary exercise of the legislative power, it is the duty of this court to afford the needed redress, and to declare the act a nullity. But at whose instance shall this be done? Plainly those whose rights were injuriously affected by the act complained of, their representatives or assigns, and they only can call upon the court to do this. A stranger to those rights merely interposing a cavil at the tenure by which a neighbor holds his property cannot be permitted to do it. If this respondent claimed under the devisees or trustees appointed under the wills of Benjamin and Hannah Joy, or under the remaindermen referred to in the will of Benjamin, the question of the validity of the resolves might be fairly before us. It nowhere appears and it is not even suggested that he does so claim." Guided by this opinion we are bound to hold that these resolves are constitutional, and that by virtue thereof the conveyances made by Sohier were valid and operative as against the present tenant. It is further claimed that the resolves did not authorize Sohier to assign and convey a mere mortgage estate. The doubt on this

point is principally raised upon the language of the resolve of 1847, by which Sohier was only authorized to sell and convey any lands of which the said Benjamin Joy "died seized, and not included in any of the contracts, bonds or other instruments for the conveyance of the same, made by the said Benjamin in his life time, and now undischarged or unsatisfied." It is insisted that as Joy had conveyed these lands to James Hewey in 1821, they were not subject to be again conveyed by Sohier, and that he had no authority to convey any land once conveyed by Joy and which had been subsequently reconveyed to him in mortgage. This construction we are not prepared to adopt; but it is not necessary that we should actually determine what is the true construction of this resolve, as the subsequent resolve of 1852, beyond all question, did confer upon Sohier full authority to make the sale and conveyance, if the former resolve was not sufficient for that purpose. The language of the resolve of 1852, after authorizing said Sohier to sell and convey the whole or any parts or parcels of the real estate of which Joy died seized is as follows: "Intending hereby that under this resolve, taken in connection with the resolve before mentioned, the powers of sale conferred on said Sohier shall extend to the whole estate of which said Benjamin died seized, excepting only such lands as the said Hannah undertook to sell as his executrix."

On the 20th Sept., 1858, Austin & als. conveyed all their interest in these lands under the Sohier title to Jos. Sherburne, and on his decease Seward Dill was appointed administrator on his estate, and at a probate court holden at Farmington in and for the county of Franklin on the 1st Tuesday of April, 1859, Dill as administrator obtained license "to sell the whole or such entire portion or portions of said Sherburne's real estate as will not injure the residue thereof, and will be for the best interests of all persons interested therein, on an advantageous offer previously made therefor." On the 31st day of March, 1860, Dill, claiming to act under and by virtue of the authority of this license, sold and conveyed the demanded premises to Ephraim Rand "in consideration of one hundred and fifty dollars, being the sum previously offered for the land and estate described, and being authorized and enforced by said court, in my aforesaid capacity, to accept said offer without further notice," as said Dill avers in his deed of conveyance.

This license from the probate court of Franklin county and the petition upon which it was granted were certainly quite vague and indefinite. No specific offer for any particular portion or for the whole of the estate is shown to have been presented to the probate court for its sanction and approval, and this court would have entertained great doubts as to the validity of any conveyance

by its authority, if it had not been for the 30th section of chapter 71, Rev. St. 1857, relating to sales of real estate by executors, &c. By this section it is enacted, "if the validity of such sale is contested by one claiming adversely to the title of the wife, ward or deceased aforesaid, or by a title not derived through either, the sale shall not be held void on account of any irregularity in the proceedings, if it appears that the license was granted by a court of competent jurisdiction and the deed duly executed and recorded." The tenant is a stranger to Sherburne's title, and makes no claim under or derived through him or his estate. The deed to Rand was duly executed and recorded under and by virtue of the license as is expressly asserted in the instrument itself, and no question is made as to the jurisdiction of the probate court of Franklin county. So that we are brought to the conclusion that under the circumstances of the present case, as against this tenant, Rand acquired by Dills' deed as administrator, the estate and interest in the premises of Sherburne at his decease.

In Dec., 1840, an attempt was made to foreclose this and other mortgages given to Joy, which we hold to have been wholly inoperative. A notice was published three weeks successively in the Franklin Register, a newspaper printed at Farmington, in the county of Franklin, which purported to be signed "Hannah Joy, Executrix, by Her Attorney, Mr. Sherburne." This notice was headed "notice of foreclosure," and was substantially as follows: "The following is a description of mortgage deeds of lots or parcels of land in Berlin, formerly plantation No. 6, in the county of Franklin, formerly Oxford, given by various persons hereinafter named to Benj. Joy of Boston, deceased. By E. Taft, Nov. 22, 1823, lot No. 2 in the 6th range, west of the 4,000 acres, covering 100 acres."

The same identical description of fifty-two other mortgages is contained in this paper, and among them appears the following: "By James Hewey, June 3, 1821, west half of lot No. 7, and south half of lot No. 8 in the 3d range," which are the premises in question. The notice then concludes by stating "that the above described mortgages are all recorded in the registry of deeds Oxford county, to which reference may be had for a more particular description of the land in each mortgage, said mortgages are given as security for the payment of certain promissory notes as described in each of them, the condition in each of said mortgages is broken, and the undersigned as executrix of the last will and testament of Benj. Joy deceased hereby gives notice that she claims to foreclose the same."

It does not appear that Hannah Joy was ever authorized to act as executrix of the will of Benj. Joy in this state, and we entertain some doubts whether a foreign executrix could thus foreclose a mortgage. But still stronger doubts are entertained as to the validity of such a wholesale attempt to foreclose fifty-two mortgages, given to Joy by different individuals at different times, of as many different parcels of land. The statute certainly never contemplated such an aggregation of claims, and we doubt if a mortgagee is to be put to the trouble and perplexity of examining so comprehensive a document to ascertain whether his estate is included therein. The recording of such a notice in the registry, unless the name of every mortgagee contained in it was set forth in the indices of deeds, etc., would certainly afford no knowledge to a party that a foreclosure had been commenced against him, and if no other objection existed to the foreclosure, we are inclined to the opinion that for this reason it was inoperative. But still another objection is presented to it, which in our view is conclusive against that foreclosure. By the act of 1838 (chapter 333), in force when this notice was given, it was provided that the notice should be published in some newspaper printed in the county where the real estate was situated, and that the notice and certificate of its publication should be recorded in the registry of deeds where the mortgage is recorded, within thirty days after the last publication of the notice, and if not so recorded, the same shall be of no avail for the purposes of foreclosure.

In the present instance the mortgage was recorded in Oxford county, whilst the notice and certificate of its publication were recorded in the registry for Franklin county in which the land was situated, and were never recorded in Oxford county in compliance with the requirements of the act then in force. For a failure in this respect, in the language of the act "the notice shall be of no avail for the purpose of foreclosing." It may be observed that by Rev. St. 1840, c. 125, § 5, the law in this respect was altered, and the notice was required to be recorded "in each registry of deeds in which the mortgage deed is or by law ought to be recorded."

July 12, 1864, in consideration of twelve dollars Rand quitclaimed all his interest in the premises to the demandant, who thereby acquired all the rights of an assignee of the mortgage given by Hewey to Joy in 1821, and he immediately commenced the present action for the recovery of the premises.

In defence it is claimed, that more than fifty years have elapsed since the mortgage was given to Joy; that the original notes and mortgage deed are not produced; that James Hewey remained in the occupation and improvement of the premises over forty years before this action was commenced, and that a strong cogent presumption of payment of the mortgage debt arises from this great length of time which has elapsed, and from the other circumstances in the case. Such is the presumption; but it is only a presumption; and if from all the evidence the court

is clearly of opinion that the mortgage debt has not been fully paid, and that the mortgage has always been regarded by the mortgageor as an outstanding liability and incumbrance upon the estate, the presumption of payment is rebutted, and the demandant is entitled to his remedy.

The facts now in proof before us clearly satisfy us that the mortgage was never fully paid by Hewey or his son; and that until 1860 James Hewey always so regarded it.

In 1840, James Hewey and his son Owen made an arrangement with Mr. Sherburne, attorney of the Joy heirs, by which it was agreed that on payment of $175, Sherburne would assign to Owen Hewey the notes and mortgage of James. Owen gave his notes for this amount payable in four annual installments. Payments in part from time to time were made upon these notes by Owen, but in 1848 the arrangement was broken. Owen's notes were surrendered to him by Sherburne, and he received back from Owen his obligation in behalf of the Joy heirs to assign the mortgage to him. Sherburne in his deposition testifies that this took place by the mutual arrangement of James and Owen Hewey and himself, and it is certainly the strongest evidence, that at that time the mortgage had not been fully paid, and that it was so understood by James Hewey.

Sherburne further testifies that he was the attorney for the Joy estate, and held in his possession James Hewey's notes until the fall of 1853, when he handed them over to Amos Cotting of Boston, an agent of the Joy estate, and that at that time the notes were unpaid.

Sherburne's testimony in relation to this point is fully sustained by that of Jos. A. Linscott, to whom on many occasions both James and Owen Hewey admitted that the Joy mortgage was unpaid. Linscott states "that about the time or soon after, Jos. Sherburne purchased the interest of the Joy heirs, Sept. 20, 1858, they both told him the old mortgage given to Joy was still outstanding and unpaid." This admission was less than six years prior to the commencement of the present action, and there is no evidence to show that it has since been paid by any party. On the contrary, on the trial of a writ of entry in Franklin county in 1861, brought by E. Rand vs. James Hewey, for the recovery of these premises, and in which the demandant was non-suited, James did not give any testimony in his own behalf that he had paid the notes, or that they had been paid by any one, although he could have been examined as a witness at that time, and the testimony would have been of vital importance in the cause.

The statutes of this state relating to real actions afford the tenant no defence on the ground that the purchase of the demandant's title constituted maintenance or champerty. Hovey v. Hobson, 51 Me. 62.

Judgment for demandant as of mortgage.